IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| BLYTH CAREY-POWE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No.: 8:19-cv-02157-GLS |
| ) | |
| WASHINGTON METROPOLITAN AREA ) | |
| TRANSIT AUTHORITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION**

Pending before this Court is a motion for summary judgment filed by Defendant Washington Metropolitan Transit Authority ("WMATA"). (ECF No. 29). Plaintiff Blyth Carey-Powe ("Plaintiff") filed an opposition, and WMATA filed its reply. (ECF Nos. 30, 31). The matter has been fully briefed. Upon review of the pleadings and the record, the Court finds that no hearing is necessary. *See* L.R. 105.6. For the reasons set forth below, Motion for Summary Judgment is GRANTED IN PART, DENIED IN PART.

**I.    Procedural and Factual Background**

Plaintiff filed her Complaint on July 23, 2019, alleging that she suffered serious and permanent injuries following a fall on September 21, 2017. Plaintiff maintains that her fall occurred due to WMATA's negligence. (ECF No. 1, Exhibit 1; ECF No. 30-7, p. 2).[1] The Complaint appears to allege several types of negligence: ordinary negligence and negligent hiring, training and supervision of employees. (ECF No. 1).

---

[1] On July 23, 2019, WMATA filed its answer and notice of removal from Prince George's County Circuit Court to this federal court. (ECF No. 1).

A. Undisputed Facts

The following facts are undisputed. On the clear, sunny morning of September 21, 2017, Plaintiff arrived at the Naylor Road Metrorail Station sometime before 8 a.m. to commute to work.[2] (Deposition of Plaintiff Blyth Carey-Powe, ECF No. 29-3 p.23, lines 16-21, ("Carey-Powe Dep."), 23:16-21). Ordinarily Plaintiff commutes from a different station, nonetheless she was familiar with the Naylor Road Station. (Carey-Powe Dep. 23:1-10). Upon entering the station, Plaintiff boarded the escalator from the mezzanine level to the upstairs platform.[3] (Carey-Powe Dep. 27:4-20). When Plaintiff reached the top of the escalator, she observed "a whole bunch of white stuff" partially cordoned off by yellow accordion barricades, which she avoided by walking to the right. (Carey-Powe Dep. 27:4-20; 34:2-16).

As the train approached the station, Plaintiff sought to board the least populated railcar. (Carey-Powe Dep. 33:11-18). However, Plaintiff slipped on a "frosty-white substance," believed to be vomit, and fell on her lower back when she attempted to board the train. (Plf.'s Answers to Def. Interrogatories, ECF No. 30-7, p. 3). Plaintiff was unsuccessful in bracing her fall, thus her shoulders and neck also hit the ground. (*Id.*) Sheila Sharpe witnessed Plaintiff's fall and assisted Plaintiff to a seated area before she notified the WMATA Station Manager for assistance. (Deposition of Sheila Sharpe, ECF No. 30-14, p.32, lines 5-13, ("Sharpe Dep."), 32:5-13).

Station Manager Rhonda Currie opened the Naylor Road Station on the day of Plaintiff's fall. (Deposition of Rhonda Currie, ECF No. 29-6, p.12, lines 2-4, ("Curry Dep."), 12:2-4). During her 4:56 a.m. inspection of the platform, Currie did not observe the white substance, nor did she see the barricades. (Curry Dep. 35:8–11). William Dickens, the on-duty station manager when

---

[2] Plaintiff does not know the exact time she arrived at the station, but she noted it was "after seven but before eight." (Carey-Powe Dep. 23:20–21).
[3] The Naylor Road Metrorail Station platform is outdoors. (Carey-Powe Dep. 46:2-5).

2

Plaintiff fell, relieved Currie at 6:56 a.m. but did not inspect the platform because he remained on the mezzanine level assisting rush hour customers. (Deposition of William Dickens, ECF 29-7, p.38, lines 1-18, ("Dickens Dep."), 38:1-18). Therefore, the platform was not inspected between 4:56 a.m. and the time of Plaintiff's fall. As such, Dickens was unaware of the white substance and the barricades until he arrived at the platform. (Dickens Dep. 40:1–10).

Although the exact time of Plaintiff's fall is unclear, it is undisputed that Dickens documented the fall at 8 a.m. on the incident report. (Dickens Dep. 38:15-18). After Plaintiff assured Dickens that she did not need medical attention, Dickens attempted to move the barricades entirely around the white substance where Plaintiff fell. (Dickens Dep. 47:13-20). However, the barricades would not expand to do so. (*Id.*)

      B.  Disputed Facts

The following facts are in dispute. The record reveals different versions of where Plaintiff fell. Consequently, the parties disagree as to where the barricades were located at the site of the fall. According to her Complaint, Plaintiff asserts that she slipped on a white substance that was only *partially cordoned off* with barricades on the platform. (ECF No. 4, p. 2). However, Plaintiff's Answers to Defendant's Interrogatories seem to contradict what the Complaint alleges. Specifically, Plaintiff's states that she fell further down the platform on "another patch of a white substance that did not have any barriers or warning signs around it." (ECF No. 30-7, p. 2). Thus, Plaintiff argues that the area in which she fell was not covered, (ECF No. 30-2, p. 3), whereas WMATA maintains that Plaintiff fell on the white substance that was partially cordoned off by barricades at the top of the escalator. (ECF No. 31, p. 5).

The parties also dispute the size of the white substance upon which Plaintiff fell. For example, WMATA assumes that Plaintiff fell on a "whole bunch" of white substance that Plaintiff

observed. (ECF No. 29, p. 15). To further its argument, WMATA relies on the deposition testimony of Sheila Sharpe, who stated that the size of the white substance was approximately six pieces of 8 1⁄2" by 11" paper. (Sharpe Dep. 14:15-22; 15:1-10). In contrast, Plaintiff argues that she fell on a smaller droplet of the same white substance. (ECF No. 30-3, p. 14). In particular, Plaintiff cites to Dickens' testimony; Dickens testified that white substance where Plaintiff fell was approximately half the size of a 9" by 12" sheet of paper (Dickens Dep. 78:20-22; p. 79).

The facts diverge regarding the time of Plaintiff's fall. WMATA argues that Plaintiff fell at 7:30 a.m., (ECF No. 31, p. 2), while Plaintiff relies on the incident report to argue that the fall occurred at 8 a.m., (ECF No. 30-2, p. 2). As a result, the parties dispute the length of time in which the white substance was on the platform prior to Plaintiff's fall. Plaintiff contends that the white substance was on the platform for an extended period of time because it was dry when Plaintiff fell. (ECF No. 30-3, p. 11). However, WMATA argues the white substance was not on the platform for an extended period of time, but rather, the sunny weather impacted it drying on the outdoor platform. (ECF No. 31, p. 7). Lastly, the parties disagree about whether Plaintiff took the necessary precautions to observe her surroundings when she attempted to board the train. Of particular relevance, Plaintiff maintains that she was looking at the train when she fell. (Carey-Powe Dep. 33:11-18). However, WMATA relies on the witness deposition testimony to argue that Plaintiff was looking at her phone when she fell. (Sharpe Dep. 7:2-12).

## II. Standard of Review

Motions for summary judgment shall be granted only if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine

issue as to any material fact. Fed. R. Civ. P. 56(a); *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987) (internal citation omitted). The burden can be satisfied through the submission of, e.g., pleadings, depositions, answers to interrogatories, admissions, and affidavits. *Celotex Corp.,* 477 U.S. at 323; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). To defeat motions for summary judgment, on the other hand, the nonmoving party cannot simply cast "metaphysical doubt" on the material facts, but rather must provide specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).

The Court must construe the facts and documentary materials submitted by the parties, including the credibility and weight of particular evidence, in the light most favorable to the party opposing the motions. *Masson v. N.Y. Magazine, Inc.*, 501 U.S. 495, 520 (1991) (citing *Anderson*, 477 U.S. at 255)). A mere scintilla of evidence is insufficient to create an issue of material fact. *See Barwick*, 736 F.2d at 958–59 (citing *Seago*, 42 F.R.D. at 632). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

**III.   Analysis**

    A. <u>Arguments</u>

In her Complaint, Plaintiff argues that WMATA breached its duty of care because it failed to maintain the premises in a safe condition when it chose to ignore the white substance on the platform and failed to warn her re: the same. (ECF No. 4, p .3). In addition, Plaintiff asserts that WMATA breached its duty of care when it chose not to hire, train, or supervise its employees to prevent, fix and/or warn of dangerous conditions on the premises. *Id.* WMATA moves for summary judgement on the following grounds: (1) it did not create the dangerous condition; (2) it

did not have actual or constructive knowledge of the dangerous condition; (3) even if Plaintiff establishes it had actual or constructive knowledge of the white substance, it is insulated from liability under the open and obvious doctrine; and (4) it enjoys sovereign immunity for decisions related to hiring, training, and supervising employees. (ECF No. 29, p. 2). The parties do not dispute whether WMATA created the dangerous condition on the platform. However, Plaintiff disputes WMATA's remaining summary judgment arguments. (ECF No. 30-3, pp. 3-25).

### B. Negligence Claim

Under Maryland law, a prima facie negligence claim requires the plaintiff to prove (1) the defendant was under a duty to protect the plaintiff from injury; (2) the defendant breached that duty; (3) the plaintiff suffered actual loss or injury; and (4) the loss or injury proximately resulted from the defendant's breach of the duty. *Todd v. Mass Transit Admin.*, 373 Md. 149, 155, 816 A.2d 930 (Md. 2003) (internal quotations and citations omitted).

In Maryland, a proprietor "owes a duty to business invitees to keep the premises in a reasonably safe condition and to remove hazards of which he has actual knowledge, or which have continued long enough to charge him with constructive notice of their existence." *Montgomery Ward & Co. v. Hairston*, 196 Md. 595, 597, 78 A.2d 190 (1951); *see also Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 389, 693 A.2d 370 (1997) ("there is no liability for harm resulting from conditions from which no unreasonable risk was to be anticipated, or from those which the occupier neither knew about nor could have discovered with reasonable care"). However, WMATA's status as a common carrier plays a role in the duty of care it owes passengers. A common carrier owes its passengers **the highest degree of care** to provide safe means and methods of transportation for them. *Todd*, *supra*, 373 Md. at 156. (emphasis added). While a common carrier must exercise the highest degree of care for its passengers' safety, it is not the

insurer of their safety. *Id.* Therefore, a common carrier owes its passengers a "duty to deliver them to their destination as expeditiously as possible, consistent with safety." *Mass Transit Admin. v. Miller*, 271 Md. 256, 259, 315 A.2d 772 (Md. 1974).

A mere injury on WMATA's premises does not create a presumption of negligence. In order to prove that the defendant breached its duty of care, specifically in a slip and fall case, the plaintiff must prove: (1) the defendant created the dangerous condition; or (2) the defendant had actual or constructive knowledge of the danger to warrant sufficient time to remedy or warn of it. *Moulden v. Greenbelt Consumer Servs., Inc.*, 239 Md. 229, 232, 210 A.2d 724 (1965). The instant case hinges on the latter because there is no evidence in the record to support that WMATA created the dangerous condition on the platform. Accordingly, Plaintiff's negligence claim turns on whether WMATA had actual or constructive knowledge of the white substance on the platform.

*1. Actual Knowledge*

Plaintiff contends that WMATA had actual knowledge of the dangerous condition because WMATA positioned the barricades around the white substance. (ECF No. 30-3, p. 5). Construing the evidence in the light most favorable to Plaintiff, the record neither establishes that WMATA had actual knowledge of the white substance nor supports such an inference.

First, Plaintiff argues that WMATA moved the barricades because it is highly unlikely that anyone else obtained them from storage and later assembled them by the white substance, unbeknownst to WMATA employees. (ECF No. 30-3, p. 5). Second, Plaintiff avers that WMATA's denial of moving the barricades is unpersuasive because its employees were deposed two and a half years after Plaintiff's fall. (*Id.* at 8). Thus, Plaintiff implies that an earlier investigation would have revealed that a WMATA employee moved the barricades near the white substance. (*Id.*).

Viewing the evidence in the light most favorable to Plaintiff, no evidence exists to support Plaintiff's supposition. This court finds that even if it is unlikely that an individual could access the barricades without a WMATA employee noticing, no evidence exists to support who placed the barricades on the platform. Put another way, Plaintiff cannot speculate that WMATA moved the barricades; the law requires Plaintiff to point to direct evidence demonstrating WMATA positioned the barricades near the white substance, or identify circumstantial evidence from which a reasonable juror can infer that WMATA placed the barricades in the area. The record before the court includes the deposition testimony of several WMATA employees from which the court can infer that the barricades were not moved by WMATA employees. For example, multiple employees recalled instances in which the barricades were moved without WMATA's knowledge or by individuals who were not WMATA employees because the barricades were stored in various locations accessible to the public. (Dickens Dep. 58:2–22; 59:6-22; Deposition of Craig Johnson, ECF No. 31-2, p.69, lines 13-21, ("Johnson Dep."), 69:13-21). The record also supports the fact that WMATA lacked actual knowledge of the dangerous condition prior to Plaintiff's fall because neither the white substance nor the barricades were documented in the inspection of the platform. (Curry Dep. 35:8–11; Dickens Dep. 38:1–18).

Thus, Plaintiff fails to point to evidence from which a factfinder can reasonably infer that WMATA employees moved the barricades to cover the white substance. or otherwise had actual knowledge of the vomit.

Accordingly, summary judgment will be GRANTED on the issue of actual knowledge.

### 2. *Constructive Knowledge*

Alternatively, Plaintiff argues that even if WMATA did not have actual knowledge of the white substance, WMATA had constructive knowledge of it. (ECF. No. 30-3, p. 10). Specifically,

Plaintiff maintains that the white substance existed on the floor for a sufficient period of time to give on-duty station manager William Dickens the opportunity to discover it and remedy the condition before Plaintiff's fall. (ECF No. 30-3, pp. 10-13). WMATA maintains it did not have constructive knowledge of the white substance on the platform prior to Plaintiff's fall. (ECF No. 31, pp. 6-7).

To prove constructive knowledge, the plaintiff must put forth evidence of how long the dangerous condition existed. *Moulden, supra*, 207 Md. at 232. Put another way, the dangerous condition must exist for a sufficient period of time such that the defendant had time to inspect the premises and could have discovered the condition in the exercise of ordinary care. *Id.*

Although a proprietor has a duty to inspect its premises, courts have held that a duty to inspect does not include a duty to continuously inspect. *Lexington Mkt. Auth. v. Zappala*, 233 Md. 444, 446, 197 A.2d 147 (1964); *see also King v. Wash. Metro. Area Transit Auth.*, Case No. TDC14-2752, 2016 WL 8716253, at *4 (D. Md. Feb. 26, 2016). In addition, even if periodic inspections are necessary, courts have found it unreasonable for a proprietor to inspect and remedy a dangerous condition as soon as it occurs. *Id.*; *see also Honolulu, Ltd. v. Cain*, 244 Md. 590, 606, 224 A.2d 433 (1966). Rather, courts determine whether a proprietor had sufficient time to discover and remedy a dangerous condition based on the facts of the particular case. *Rawls v. Hochschild*, 217 Md. 113, 122, 113 A.2d 405 (1955). Specifically, in a slip and fall case, "time on the floor" evidence is instructive to establish constructive notice and the care to be exercised by the proprietor. *Maans v. Giant of Md., L.L.C.*, 161 Md. App. 620, 639-40, 871 A.2d 627 (2005). Courts turn to "time on the floor" evidence for two reasons:

> (1) a demonstration of how long the dangerous condition existed prior to the accident so that the fact-finder can decide whether the storekeeper would have discovered it if he or she had exercised ordinary care; and (2) it also shows that the interval between inspections was at least as long as the time on the floor. Thus,

>proof of time on the floor is relevant, not only as to notice but also as to the issue of what care was exercised.

*Maans,* at 641.

The appearance of a substance, by itself, does not necessarily warrant an inference that the defendant had constructive knowledge of it. *Moulden, supra,* 207 Md. at 233. In *Moulden*, a customer slipped on a string bean as she walked down a grocery store aisle. The customer did not see the string bean prior to her fall, however, afterwards she noticed a discolored string bean on the floor. Her theory of "time on the floor" evidence was premised on the discoloration of the bean; she inferred that the bean was on the ground for a sufficient period of time such that the grocer could have noticed it and removed it prior to her fall. 239 Md. at 231. However, the Court found that the color of the bean, by itself, was insufficient to warrant an inference that the store had sufficient time to discover it. The court opined that the evidence did not establish that the bean did not fall on the floor moments before the incident or change colors when the customer stepped on it. *Id.* at 233. The court further reasoned that it is unreasonable for a store owner to conduct a continuous inspection of the store. Thus, the store did not have constructive knowledge of the dangerous condition. *Id.* The holding from *Moulden* indicates that without determining the time that something is on the floor, considering just its color, without additional evidence, does not necessarily establish that the defendant could have discovered and remedied the danger.

A later case, *Kurtz v. Wal-Mart Stores*, 338 F. Supp. 2d 620 (D. Md. 2004), continues the analysis that begins in *Moulden*. Of particular relevance, the *Kurtz* court cites to *Moulden* to assess how the sufficiency of "time on the floor" evidence varies when the substance is a liquid as opposed to a solid (i.e. string bean). In *Kurtz*, the defendant challenged two arguments made by plaintiff: (1) that because the liquid upon which the plaintiff slipped had begun to dry at the edge, it constituted evidence from which a reasonable inference could be drawn that it was on the floor

long enough "for a person under a duty of care to [have discovered it];" and (2) that a store owner has a duty to inspect its premises. The court did not agree with the defendant. First, the court found that certain characteristics of a substance can supply clues as to how long it has been on the ground, while other characteristics cannot. *Id.* at 621. In particular, the court determined that evidence of a partially dried liquid can offer insight as to how long it has been on the floor. *Id.* at 621. Second, the court found that Maryland law clearly recognizes a duty to inspect. The lesson from *Kurtz*, then, is that evidence of a dried or hardened liquid is sufficient to warrant an inference that it was on the floor long enough to be discovered. *Id.*

The facts of the instant case are analogous to *Kurtz*. Plaintiff relies on *Kurtz* to argue that the dried consistency of the white substance allows a reasonable juror to infer that the vomit was present long enough to enable WMATA, in the exercise of ordinary care, to discover it and address it. (ECF No. 30-3, p. 11). To advance her "time on the floor" argument, Plaintiff presents evidence that the white substance was partially dry when she fell. *See* Dickens Dep. 29:20-22. (Dickens testified that the white substance was "dry and it was hard. It wasn't like somebody just did it. You know it was dry.").

Defendant WMATA counters that: (1) Plaintiff's "time on the floor evidence" is insufficient because the white substance likely dried due to the sunny weather; and (2) Plaintiff's reliance on *Kurtz* is misplaced because the court only found that a liquid substance established sufficient "time on the floor" evidence when the defendant did not perform an inspection of the premises.

The Court finds WMATA's argument unavailing. First, reasonable minds may differ as to whether the sun, the passage of time, or something else caused the white substance to dry. Second, whether a proprietor had sufficient time to discover a dangerous condition does not necessarily

11

depend just on whether an inspection was performed, but rather it depends upon the facts and circumstances in each particular case. *Rawls*, supra, 217 Md. at. 122; *compare Moulden,* 239 Md. at 231 (court found insufficient "time on the floor" evidence, although the proprietor inspected the aisle where plaintiff fell), *with Maans, supra*, 161 Md. App. at 630-33 (court found insufficient "time on the floor" evidence even though the proprietor did not inspect the aisle where plaintiff fell). Third, the record reflects at least 2 ½ hours elapsed between Ms. Currie's inspection (no substance observed) and the time that Plaintiff fell. Thus, Plaintiff's reliance on *Kurtz* is not misplaced. Viewing the record in the light most favorable to Plaintiff, a reasonable juror could infer that the dried consistency of the white substance suggests that the vomit was on the platform long enough for WMATA to discover it and remedy the condition, or to warn others about it. Accordingly, the Court finds that the issue of constructive knowledge presents a jury question. Summary judgment will be DENIED on the issue of constructive notice.

### C. Open and Obvious

WMATA argues, in the alternative, that even if it should have known of the white substance, it is still entitled to summary judgement because the dangerous condition was open and obvious to the Plaintiff. (ECF No. 29, p. 2). Conversely, Plaintiff argues that multiple disputes of material fact, such as the location of her fall, the size of the white substance she slipped on and its proximity to the barricades, establish that the white substance was not open and obvious. (ECF No. 30-3, pp. 14-18). In its reply, WMATA maintains that the dangerous condition was open and obvious, assuming that Plaintiff fell at the initial site of the white substance that was partially cordoned off by barricades (at the top of the escalator). (ECF No. 31, p. 8).

An "open and obvious" condition is one where the condition and risk are apparent to—and would be recognized by—a reasonable person exercising ordinary perception, intelligence, and

judgment. *Coleman v. United States*, 369 F. App'x 459, 462 (4th Cir. 2010) (internal quotations and citations omitted). A proprietor ordinarily has no duty to warn an invitee of an open and obvious danger. *Casper v. Chas. F. Smith & Son, Inc.*, 316 Md. 573, 582, 560 A.2d 1130 (Md. 1989). Therefore, an invitee has a duty to exercise due care for her/his own safety, and a duty to look at her/his surroundings. *Tennant*, *supra*, 115. Md. App. at 389.

WMATA relies on *Ramseur v. United States*, 587 F. Supp 2d 672 (D. Md. 2007), and *Gellerman v. Shawan Rd. Hotel Ltd. P'ship, et al.*, 5 F. Supp 2d 351, 353-54 (D. Md. 1998), to argue that the white substance was open and obvious, even if Plaintiff failed to see it. WMATA's argument is unavailing.

Plaintiff concedes that she saw "a whole bunch of white stuff" at the top of the escalator. (Carey-Powe Dep. 27:4-20). However, Plaintiff maintains that she did not fall on that particular white substance because she fell further down the platform where the white substance reportedly was smaller. (Plf.'s Answers to Def. Interrogatories, p. 2; Dickens Dep. 78:20-22; p. 79). Dickens Dep. 78:20-22; p. 79). Some pictures and Sharpe's testimony offer conflicting versions of the location of the fall. In her deposition, Sharpe identified the location of the fall as a large pile of white substance (Sharpe Dep. 14:15-22; 15:1-10), however the pictures do not reflect that the location of the fall was by the escalator. (ECF No. 29-4, pp. 18-20). In addition, the pictures (and Sharpe's testimony) reflect that the white substance was strewn across the platform and was of various sizes, (*Id.*; Sharpe Dep. 19:10-11), which supports Dickens testimony of it being smaller in size. (Dickens Dep. 78:20-22; p. 79).

In *Ramseur*, the plaintiff tripped over a large perforated mat when leaving a conference room. The plaintiff conceded that she saw the mat on the way into the room, but she did not look down on her way out and thus her heel got trapped in the mat. The court found that the mat's

presence was undoubtedly open and obvious because "Ms. Ramseur conceded, if she had looked down, she would have realized the potential danger and thus a warning would not have been necessary." 587 F. Supp 2d at 684. However, the facts of this case differ from *Ramseur* in several respects. First, the size of the white substance is in dispute. Second, the location of the white substance is in dispute. Plaintiff denies that she fell near the barricades. Third, whether the substance that she slipped on was surrounded by barricades is also in dispute. Fourth, Plaintiff denies seeing the substance before she fell. Furthermore, the parties dispute whether Plaintiff's attention was reasonably focused on boarding the train or if Plaintiff was looking at her phone at the time of her fall. (ECF No. 30-3, p. 11; ECF No. 31, p. 8). Thus, it is unclear whether Plaintiff could have seen the white substance before she fell.

In *Gellerman*, the plaintiff tripped on a small space, believed to be less than an inch in size, between the curb and adjoining sidewalk. Although the plaintiff did not see the gap, the court found that it should have been open and obvious to the plaintiff because it is common knowledge that small cracks, holes and uneven spots often develop in pavement so long as nothing obstructs or interferes with one's ability to see such a 'static' defect. 5 F. Supp 2d at 351. Therefore, the court found the fact that the plaintiff was keeping an eye out for moving vehicles did not constitute a distraction, so as to excuse her failure to observe the defect. *Id.*

The instant case in distinguishable from *Gellerman* because the presence of the white substance on the platform was neither common, nor a 'static' defect. Unlike the facts presented in *Gellerman*, there is no evidence in this record that the white substance (or vomit) regularly appeared on WMATA platforms such that its presence would be of common knowledge to passengers. In addition, the white substance was not a static defect, as both Plaintiff and Sharpe testified that the white substance left a trail of various-sized droplets along the platform. (Sharpe

Dep. 19:10-11; Plf.'s Answers to Def. Interrogatories, ECF No. 30-7, p. 2). Courts have found it appropriate to let a jury decide whether it was reasonable for an invitee to fail to observe a potentially dangerous condition. *See, e.g., Tennant*, *supra*, 115. Md. App. 381 (finding the jury entitled to consider whether appellant's attention was reasonably focused on selecting produce that was on display); *see also Wiseman v. Wal-Mart Stores, Inc.*, No. SAG 16-4030, 2017 WL 3334858, at *7 (D. Md. Aug. 4, 2017) (recognizing a jury could find that a prudent person while shopping at a store would not be continuously looking at the floor, but rather looking at the items on display). Thus, a material issue of fact exists as to whether Plaintiff exercised due care for her surroundings.

In sum, material facts remain in dispute as to whether the white substance was open and obvious, and whether Plaintiff exercised due care for her surroundings.

Summary judgment will be DENIED on this issue.

### D. Sovereign Immunity

Plaintiff argues that WMATA does not enjoy sovereign immunity for the negligent hiring, training, and supervision of employees because the conduct at issue does not leave room for discretion. (ECF No. 30-3, p. 21). Relatedly, Plaintiff argues that because WMATA's Standard Operating Procedures (SOP) include mandatory maintenance directives to keep the platform safe, the decision not to comply with such directives cannot be grounded in policy. (*Id.* at 23.) In contrast, WMATA asserts that it retains sovereign immunity because decisions related to the hiring, training, and supervision of employees are discretionary and grounded in policy judgments. (ECF No. 31, pp. 8-9). The Court agrees with WMATA.

Maryland, Virginia, and the District of Columbia created WMATA to provide transportation in the Washington D.C. metro area. *Delon Hampton & Assocs., Chartered v. Wash.*

15

*Metro. Area Transit Auth.*, 943 F.2d 355, 357 (4th Cir. 1991). A Compact between the three governments established WMATA as an interstate agency and instrumentality of each signatory. *Id.* at 358. Thus, WMATA enjoys the same rights and privileges as a state, including sovereign immunity. *Pierce v. Wash. Metro. Area Transit Auth.*, Case No. DKC 09-1917, 2010 WL 4485826, at *3 (D.Md. Nov. 9, 2010); *see also Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 206 (4th Cir. 2002).

WMATA enjoys a unique type of sovereign immunity with respect to certain claims. *Pierce*, 2010 WL 4485826, at *3. The extent of WMATA's sovereign immunity is outlined in Section 80 of the Compact, which states, in pertinent part:

> The Authority shall be liable for its contracts and for its torts and those of its directors, officers, employees, and agents committed in the conduct of any proprietary function, in accordance with the applicable signatory (including rules of conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function.

Md. Code Ann., Transp. § 10–204(80) (2010).

Put another way, WMATA retains its immunity for torts arising out of governmental functions but waives its sovereign immunity for torts arising out of proprietary functions. *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 710, 990 A.2d 1048 (2010).

As a threshold matter, the court must determine if the challenged conduct was a quintessentially governmental function, such as involving law enforcement. *Smith*, *supra*, 290 F.3d at 207; *Doe v. Washington Metro. Area Transit Auth.*, No. KBJ 19-1298, 2020 WL 1429937, at *4 (D.D.C. 2020). If so, WMATA's sovereign immunity bars the claim. *Smith*, *supra*, 290 F.3d at 207 *Id.* However, if the act is not quintessentially governmental, i.e., it is proprietary, a court must determine whether WMATA was engaged in a discretionary act or a ministerial act. *Id.* Courts have found that a "discretionary act" is analogous to an agency's governmental functions

16

for which it retains immunity. *Smith*, *supra*, 290 F.3d at 207. Conversely, a "ministerial act" falls within an agency's proprietary functions for which it waives immunity. *Id.* Therefore, the Fourth Circuit employs a two-part test adopted by the D.C. Circuit to further delineate the distinction between a governmental function and a proprietary function. *Id.*; *Doe*, *supra*, at *4. At step one, a court determines whether a "federal statute, regulation, or policy **specifically** prescribes a course of action for an employee to follow." *KiSKA Constr. Corp. v. Wash. Metro. Area Transit Auth.*, 321 F.3d 1151, 1159 (D.C. Cir. 2003) (emphasis supplied). If that statute, regulation or policy leaves no room for discretion regarding the agency's conduct, then the challenged conduct is deemed a proprietary function for which sovereign immunity is waived. *Whiteru v. Wash. Metro. Area Transit Auth.*, 258 F. Supp. 3d 175, 185 (D.D.C. 2017). Absent any federal statute, regulation, or policy that prescribes a course of action, or if such authority leaves room for discretion, the court proceeds to step two. *Id.* at 186. At step two, the court evaluates the extent of the agency's exercise of discretion and the limits (if any) on its decision-making. *Id.* at 186 (internal quotations and citations omitted). In doing so, courts have found that a discretionary act "grounded in social, economic, and political policy" is analogous to a governmental function under the Compact. *Tinsley v. Wash. Metro. Area Transit Auth.*, 429 Md. 217, 235, 55 A.3d 663 (2012). Therefore, WMATA's immunity is limited to discretionary acts grounded in policy. *Id.*

In this case, the hiring, training, and supervision of employees is not a quintessential governmental function because it is not a law enforcement related activity. *Doe*, *supra*, at *4. Thus, the court has to proceed to step one under, *KiSKA*, to analyze whether a federal statute, regulation, or policy specifically prescribes a course of action for WMATA employees to follow.

Plaintiff argues that "the issue is whether the employees who were, or should have been working that day, followed WMATA's clear policies." (ECF No. 30-3, p. 22). However, the issue

17

is not whether WMATA employees followed WMATA's clear policy, but, rather, whether WMATA policy leaves room for discretion, and if so, whether the exercise of discretion is grounded in social, economic or policy goals. *Whiteru*, *supra,* 258 F. Supp. 3d at 185.

Thus, *Whiteru, supra*, is instructive. In *Whiteru*, the plaintiffs presented evidence that WMATA had a policy for station managers to inspect the platform each hour and at closing time. *Id.* at 186. Because the policy specifically required station managers to walk the entire length of the platform, the court reasoned that the discretion of which areas to search was not grounded in social, economic, or political goals, but instead grounded in WMATA mandatory walk-through closing directives. Therefore, the court found that "the failure to conduct a reasonable investigation of the train platform did not implicate the agency's governmental function but instead fit within its proprietary function." *Id.* at 188-189. Thus, the holding from *Whiteru* is that WMATA waives its immunity if it exercises discretion in decisions regarding specific directives that do not allow employees to deviate from the procedure. *Id.* at 188-89.

This case is analogous to *Pierce*. In *Pierce*, the plaintiff filed a complaint alleging negligent design of a fence, but to some extent, characterized her claim as relating to the operation and maintenance of a fence. 2010 WL 4485826, at *3-5. The court did not dismiss the case because the plaintiff's maintenance claim was "interwoven" with apparent design claims. *Id.* at *5. However, the court found that both claims involved discretionary functions for which WMATA was shielded from liability. *Id.* at *6.

Similar to *Pierce*, it appears that Plaintiff 's Complaint alleges the negligent hiring, training, and supervision of employees, however, the WMATA policies cited by Plaintiff read as a direct attack on the maintenance and cleaning of the platform. (Metrorail Stations Standard Operating Procedures, ECF No. 30-8, p. 2; Southern Avenue Cleaning Schedule, ECF No. 30-15).

*Compare Pierce*, *supra*, at *5. For example, Plaintiff argues that Dickens failed to follow the maintenance directives that requires employees to inspect the platform for dangerous conditions. (Metrorail Stations Standard Operating Procedures, p. 2). However, the record is devoid of any hiring, training, or supervising directives. (*Id.*). Therefore, it appears that Plaintiff's negligent hiring claim is not interwoven with a maintenance claim, but rather, solely a maintenance claim. *Pierce*, *supra*, at *5. Because Plaintiff failed to provide a federal statute, regulation, or policy that prescribes a course of action for hiring, training, and supervising, the Court must assess the extent to which WMATA exercised discretion.

The Court finds Plaintiff's argument unavailing for two reasons. First, the D.C. Circuit found that decisions related to the hiring, training, and supervision of employees are discretionary in nature and fall within the governmental functions for which WMATA enjoys immunity. *Burkhart v. Wash. Metro. Area Transit Auth.*, 324 U.S. App. D.C. 241, 112 F.3d 1207, 1217 (1997). The court reasoned that numerous factors influence such decisions and require the exercise of political, social, or economic judgment. *Id.* Accordingly, WMATA's sovereign immunity bars Plaintiff's negligent hiring, training and supervision of employees claim. Second, the Maryland Court of Appeals has held that WMATA is immune from suit where it exercises policy judgments to determine the timing of necessary floor cleanings. *Tinsley*, *supra*, 429 Md. 225. Therefore, WMATA did not waive its sovereign immunity when it timed its floor cleanings to optimize safety on the mezzanine level. *Compare id.* at 239-40 (finding "maintenance decisions about when to clean [are] based on economic and policy considerations that balance ensuring safe conditions against not impeding pedestrian traffic, creating a cleaning schedule against WMATA's budget, and the most efficient maintenance methods.").

Here, Plaintiff presents evidence of WMATA's SOP related to the Station Manager Procedures and the custodian cleaning schedule that outline the maintenance protocol for platform inspections. (ECF No. 30-15; ECF No. 30-18). However, unlike the evidence presented in *Whiteru*, Plaintiff provides WMATA policies that do not include **specific** protocol. And although WMATA concedes that its internal policies and cleaning schedules require station managers to inspect the platform, (Dickens Dep. 38:1–18), it also provides evidence that maintenance policies allow for discretion because station managers are expected to be on the mezzanine level assisting customers during rush hour. (*Id.*). Therefore, the Court finds that Plaintiff has not set forth evidence that WMATA waived its immunity because its decision to inspect the platform is grounded in social and economic policy to ensure services are provided to rush hour customers. Accordingly, WMATA's decision falls within a governmental function where it retains sovereign immunity.

In sum, the Court finds that WMATA is immune from suit under Plaintiff's negligent hiring, training, and supervision claim.

Summary judgment will be GRANTED on the issue of sovereign immunity.

**IV.    Conclusion**

For the foregoing reasons, Defendant WMATA's Motion for Summary Judgment is **DENIED IN PART, GRANTED IN PART**. (ECF No. 29).


Dated: September 10, 2020                                              /s/
                                                             The Honorable Gina L. Simms
                                                             United States Magistrate Judge